IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. BAH-21-432 |
| | * | |
| WILLIAM RASHEEM JAMAL RICH, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | |
| | ****** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its undersigned counsel, hereby submits the following memorandum in aid of sentencing in the above-captioned case, which is scheduled for October 15, 2024, at 2:00 p.m. For the reasons set forth below, the Government requests that the Court impose a sentence of **41 months imprisonment, to be followed by 3 years of supervised release,** which the government believes is a sentence sufficient, but not greater than necessary, to achieve the sentencing goals set forth in 18 U.S.C. § 3553.

**I.      Procedural Background and Crime of Conviction**

On October 13, 2021, William Rasheem Jamal Rich ("Rich" or the "Defendant") was charged in a criminal complaint with Wire Fraud, in violation of 18 U.S.C. § 1343 and Theft of Government Property, in violation of 18 U.S.C. § 641.  ECF No. 1. The Defendant had an initial appearance the same day, where he was released with conditions. ECF. Nos. 7 and 11. On October 21, 2021, a federal grand jury returned a six-count Indictment, charging the Defendant with five counts of Wire Fraud and one count of Theft of Government Property. ECF. No 14.

On June 25, 2024, the Defendant was found guilty, via a jury trial, on all six counts of the Indictment. ECF. No. 125.

In a subsequent Order, this Court directed the U.S. Probation Office ("Probation") to prepare a Pre-Sentence Investigation Report ("PSR"), which was filed on September 6, 2024. ECF Nos. 128 and 130. Sentencing is scheduled for October 15, 2024. ECF. No. 128.

## II.     Government Statement of Facts

The Government proved the following facts beyond a reasonable doubt at trial:

Wire Fraud (Counts 1-5)

### A.     Scheme to Defraud

On April 13, 2007, Rich arrived for a Compensation and Pension ("C&P") Exam at the United States Department of Veterans Affairs ("VA"). During that exam, Rich told the examining physician that he could not stand or walk and had no sensation from the navel down. In May 2007, via a Memorandum, the VA noted inconsistencies between Rich's C&P Exams. Notably, in April 2007, medical records listed Rich as paraplegic, and in the same month, Rich had no reported weakness, atrophy, or fascualation. Due to those inconsistencies, the VA sent Rich to a subsequent C&P Exam in October 2007. At that exam, Rich reported that after an August 2005 military bombing, he was paralyzed in both lower extremities and was confined to a wheelchair. Based in part on that examination, Rich began received Special Monthly Compensation ("SMC") from the VA, at the 2nd highest rate available, for loss of use of the lower extremities. The VA subsequently rated him as permanently and totally disabled.

After that rating, Rich only reported to the VA for rehabilitative care once a year at the Veteran's Health Administration (Hereinafter "VHA"). Those examinations were never reported to the Veteran's Benefit Administration (Hereinafter "VBA"). During rehabilitative care exams, Rich never reported being wheelchair bound or being unable to use his lower extremities. After receiving a total and permanent disability rating, Rich's social media accounts showed him exercising, standing in photos with friends and family, all without a wheelchair or another assistive ambulatory device.

In 2018, the VA began a proactive review of all veterans receiving more than $8,000 per month, which included Rich. Special agents conducted surveillance of Rich for more than six months and never saw him using a wheelchair. Instead, they saw him walking, standing, and bending as he went to various restaurants, the grocery store, and the mall. In February 2021, Rich called the VA and told a customer service representative that he was in a wheelchair, could not walk, and could not carry anything. The day after that call, Rich arrived in a wheelchair at a C&P Exam ordered by the VA. During the exam, Rich told the doctor he was in a wheelchair because both of his feet were paralyzed. However, from May 2021 to

2

June 2021, VA Special Agents observed Rich walking without a wheelchair and using his feet. In June 2021, Rich arrived at a 2nd C&P Exam ordered by the VA, Rich again reported he had total loss of strength in both his right and left foot. Yet, later the same day, VA surveillance of Rich showed him at Sam's Club walking and using both feet to shop.

In October 2021, VA agents interviewed Rich and he confirmed that his past statements to the VA, regarding his ability to walk, were not true. Moreover, during cross-examination of every witness called by defense counsel, each witness confirmed that they never saw Rich in a wheelchair and saw him walking.

### B. Defendant Willfully Participated

Surveillance video and pictures admitted at trial showed Rich arriving at VA exams in a wheelchair, but he never used a wheelchair outside of attending VA appointments. Moreover, Rich only reported being wheelchair-bound during C&P Exams, which were the only exams impacting his disability compensation award. Rich willfully acted to misrepresent his abilities to use his lower extremities in a scheme to defraud the VA out of disability compensation funds he was not entitled to.

### C. Defendant Caused Use of Interstate Wires

At trial, Sarah Haddock, Director of Finance and Business Transformation for the VBA, testified that Rich received VA benefit funds of $8,490.77, via direct deposit, and the funds traveled across state wires, specifically from May 2021 to September 2021. The funds were transmitted from wires originating in Texas, traveling through Illinois and Missouri, ending in Rich's Wells Fargo bank account in Minnesota.

## Theft of Government Property (Count 6)

### A. Money Belonged to the United States Government

At trial, Lisa Claxton, an Authorization Quality Review Specialist from the Department of Veterans Affairs Baltimore Regional Office testified that the benefit funds Rich received belonged to the United States government.

### B. Defendant Stole the Property

At trial, it was established that Rich tried to conceal his ability to walk and use his lower extremities to receive benefit funds he was not entitled to. Rich received and used money (property) of the United States government while knowing he was not entitled to it.

  **C.** **Defendant acted Knowingly and Willfully with the Intent to Deprive the Government of the Use and Benefit of Its Property**

At trial, it was established that Rich knowingly and willfully concealed his ability to walk and use his lower extremities to receive benefit funds he was not entitled to. Rich received and used money (property) of the United States government while knowing he was not entitled to it.

Surveillance video and pictures admitted at trial showed Rich arriving at VA exams in a wheelchair, but it appeared, Rich never used a wheelchair outside of attending VA appointments. Moreover, Rich only reported being wheelchair-bound during C&P Exams, which were the only exams impacting his disability compensation award. Rich knowingly acted to misrepresent his abilities to use his lower extremities in a scheme to defraud the VA out of disability compensation funds he was not entitled to.

  **D.** **Value of the Money was Greater than $1,000**

At trial, Lisa Claxton, an Authorization Quality Review Specialist from the Department of Veterans Affairs Baltimore Regional Office testified that in 2021, Rich received an extra $4,000 per month, he was not entitled to receive.

**III.** **Loss Amount to the VA Proven at Trial**

At the Defendant's trial, via a witness from the VA, the government introduced Govt. Exhibit No. 28, which highlights in red (page 1 of 5), the disability compensation overpayment amount the Defendant received from the VA based on his scheme to defraud the government. That amount is $668,773.76 (see government trial exhibit 28).

Also at trial, via a witness from the VA, the government introduced Govt. Exhibit No. 30, which breaks down the total program/benefit amounts the Defendant received from the VA as part of his fraud scheme. The total amount, which included the disability compensation overpayment referenced above is **$774,367.05** (see government trial exhibit 30).

Counts one through five of the Indictment note specific wire payments the Defendant received from May 2021 to September 2021, with five individual payments of $8,490.77. However, as outlined in the Indictment, the Defendant engaged in a scheme to defraud the government beginning in or about April 2007 and received over $767,000 in benefits from the VA to which he was not entitled (see Indictment, ECF No. 14, pages 2 and 4).

Moreover, at trial, this Court instructed the jury that to find the Defendant guilty of Wire Fraud, they must find that the government proved three elements beyond a reasonable doubt, including that there was scheme or artifice to defraud. On page 33 of the jury instructions, the scheme to defraud was outlined and read to the jury. **The scheme specifically detailed that the defendant received over $767,000 in benefits he was not entitled to**.

## IV. Sentencing Guidelines

### A. Calculation of the Sentencing Guidelines

The Government agrees with the advisory U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculations made by Probation. PSR, ECF 128 & 130, at ¶¶ 27-37. Specifically, that:

- The 2023 Guidelines Manual, incorporating all guideline amendments, was used to determine the Defendant's offense level. USSG §1B1.11.

- Counts 1-6 are grouped for guideline calculation purposes because one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the count, and the offense level is determined largely on the basis of the total amount of harm or loss. USSG §3D1.2(c) and (d).

**Count 1**: **Wire Fraud**

- Base Offense Level: The guideline for a violation of 18 U.S.C. § 1343 is USSG §2B1.1. The base offense level is 7. USSG §2B1.1(a)(1).

- Specific Offense Characteristics: Because the intended loss value was more than $550,000 but less than $1,500,000, 14 levels are added. USSG 2B1.1(b)(1)(H).

- Victim Related Adjustment: None.

- Adjustment for Role in the Offense: None.

- Adjustment for Obstruction of Justice: The Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense; therefore, two levels are added. USSG §3C1.1.

- Adjusted Offense Level (Subtotal): 23

- Chapter Four Adjustment: The Defendant meets the criteria at USSG §§4C1.1(a)(1)-(10). Therefore, the defendant is a Zero-Point Offender, and the offense level is reduced by two levels. USSG §§4C1.1(a) and (b).

- Acceptance of Responsibility: As of completion of the presentence investigation, the Defendant has not clearly demonstrated acceptance of responsibility for the offense. USSG §3E1.1.

- **Total Offense Level:** **21**

The Government agrees with U.S. Probation that the Defendant's total offense level of 21, and he has a criminal history category of I. *Id*. at ¶¶ 37 and 40. The sentencing guidelines range is therefore 37 months to 46 months.

However, the Government respectfully submits that a departure under USSG §5H1.11 Military Record, Charitable Service, Good Works does not apply for the reasons that follow.

Pursuant to language provided in the United States Sentencing Guidelines, "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an **unusual degree** and distinguishes the case from the typical cases covered by the guidelines." "Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily

6

relevant in determining whether a departure is warranted."

The Defendant served in the military from the time he was 17-years old, until he was injured in a bombing in Iraq in August of 2005. Without delay, the VA provided the Defendant with consistent medical care, in a system designed to treat the most vulnerable veterans. As elicited from a defense witness at trial, upon enlisting in the military, new soldiers learn the following values: loyalty, duty, respect, selfless service, honor, integrity, and personal courage. When the Defendant decided to defraud a system designed to support and protect our most vulnerable service members, he divorced those values. He should not receive a downward departure for military service he actively defaced through multiple, willfully deceptive acts to enrich himself so he could "be at home with his children."[1] While service members deserve our utmost respect for their service, like any other public servant, they are held to a higher standard of honor. The Defendant acted far below that standard for more than a decade.

There was no evidence presented at trial demonstrating that the VA failed to provide the Defendant with the care and support he needed. In fact, despite recognizing the Defendant's fraud, the VA is still paying the Defendant disability benefits, which match his true level of disability. Moreover, as the government noted in its closing argument at trial, in February 2021, when the VA yet again, gave the Defendant an opportunity to be honest about his physical abilities, the Defendant was brazen in his deceptive statements and actions (e.g., wheeling himself into VA appointments, telling staff he had not use of his lower extremities, but walking around shopping the same day). The Defendant did not engage in passive fraud. He engaged in active fraud, all in efforts to continue receiving compensation he was not entitled to. Perhaps, had the Defendant been honest with the VA in 2021, he could have avoided being charged altogether. Instead, he chose

---

[1] Quoted language taken from the Defendant's October 2021 Mirandized interview.

deception over and over again.

Aside from his deceit of the VA, the Defendant defamed another veteran, in court, under the penalty of perjury, in efforts to avoid accountability for his actions.[2] At the May 9, 2024, motion hearing, the Defendant did not demonstrate respect, selfless service, honor, integrity, or personal courage. In flagrantly maligning the reputation of another veteran, Special Agent Felix Beltran, the Defendant showed disrespect, selfishness, dishonor, dishonesty, and a lack of courage. The Defendant's false statements about Special Agent Beltran demonstrated a disturbing callousness. In sum, while the Defendant's miliary service is noteworthy, it is not present to a degree that distinguishes his case from typical cases covered by guidelines. The Defendant's Army service does not warrant a downward departure.

## V.     Section 3553(a) Sentencing Factors

The Government respectfully submits that a sentence of 41 months in prison, followed by 3 years of supervised release, will be sufficient, but not greater than necessary, in light of the factors articulated in 18 U.S.C. § 3553(a).

### A.     Nature & Circumstances of the Offense

For 14 years (2007-2021), the Defendant defrauded the VA, receiving over a half million dollars in funds he was not entitled to. There was no evidence produced at trial showing the Defendant could not work. The evidence indicates he did *want to work*.

The Defendant, served in the United States Army, on active duty, from 1998-2005. In August 2005, while on active duty, he was injured in a bombing in Iraq. ECF. No. 14.  As a result,

---

[2] The government believes the Defendant's testimony at the May 2024, motion hearing, regarding Special Agent Felix Beltran, was a willful attempt to obstruct justice. That testimony is the basis for the government's request for a guideline enhancement for obstruction under USSG §3C1.1

he had service-connected injuries, including temporary paralysis. *Id.* However, at least six weeks after the bombing, medical evidence showed signs of paralysis recovery. *Id.* An August 2005 MRI showed no spinal cord impingement, no spinal cord abnormalities, and possible cord infarction. The Defendant's paralysis had resolved, and he was able to move his lower extremities. *Id.* Nonetheless, during subsequent Compensation and Pension Examinations (Hereinafter "C&P Exams"), he reported to doctors that he was wheelchair-bound and could not walk or stand. *Id.*

The VA provided the Defendant with Rehabilitative Care from August 2005 to December 2006. PSR at ¶ 7. In March of 2007, the Defendant began receiving disability compensation from the VA at the maximum amount. *Id.* Also in 2007, the VA began providing the Defendant with SMC. Among other injuries, the Defendant was compensated for loss of use of the lower extremities. *Id.* The Defendant's disability compensation included allotments for his minor children and spouse(s). *Id.* As of 2021, the Defendant received the 2nd highest rate of SMC/disability compensation. *Id.* By 2021, the Defendant's compensation award exceeded $8,000 per month, which he received via direct deposit. *Id.*

As previously noted, in In May 2007, via a Memorandum, the VA noted inconsistencies between the Defendant's C&P Exams. PSR at ¶ 8. Notably, in April 2007, medical records listed the Defendant as paraplegic, and in the same month, he had no reported weakness, atrophy, or fascualation. *Id.* Due to those inconsistencies, the VA sent the Defendant to a subsequent C&P Exam in October 2007. *Id.* At that exam, the Defendant reported that since his August 2005 military bombing, he was paralyzed in both lower extremities and was confined to a wheelchair. *Id.* Based in part on that examination, the Defendant received SMC at the 2nd highest rate available, for loss of use of the lower extremities, and the VA rated him as permanently and totally disabled. *Id.*

After that rating, the Defendant only reported to the VA for rehabilitative care once a year at the Veteran's Health Administration (Hereinafter "VHA"). PSR at ¶ 9. Those examinations were never reported to the Veteran's Benefit Administration (Hereinafter "VBA"). *Id.* During rehabilitative care exams, admitted at trial, he never reported being wheelchair bound or being unable to use his lower extremities. *Id.* After receiving a total and permanent disability rating, the Defendant's social media accounts showed him exercising, standing in photos with friends and family, all without a wheelchair or another assistive ambulatory device. *Id.*

In 2018, the VA began a proactive review of all veterans receiving more than $8,000 per month, which included the Defendant. PSR at ¶ 10. Special agents conducted surveillance of the Defendant for more than six months and never saw him using a wheelchair. Instead, they saw him walking, standing, and bending as he went to various restaurants, the grocery store, and the mall. *Id.* In February 2021, the Defendant called the VA and told a customer service representative that he was in a wheelchair, could not walk, and could not carry anything. *Id.* The day after that call, Rich arrived in a wheelchair at a C&P Exam ordered by the VA. *Id.* During the exam, Rich told the doctor he was in a wheelchair because both of his feet were paralyzed. *Id.* However, from May 2021 to June 2021, VA Special Agents observed the Defendant walking without a wheelchair and using his feet. *Id.* In June 2021, Rich arrived at a 2nd C&P Exam ordered by the VA, the Defendant again reported he had total loss of strength in both his right and left foot. *Id.* Yet, later the same day, VA surveillance of the Defendant showed him at Sam's Club walking and using both feet to shop. *Id.*

In October 2021, VA agents interviewed the Defendant, and he confirmed that his past statements to the VA, regarding his ability to walk, were not true. Moreover, during cross-

examination of every witness called by defense counsel, each witness confirmed that they never saw the Defendant in a wheelchair and saw him walking. PSR at ¶ 11.

Surveillance video and pictures admitted at trial showed the Defendant arriving at VA exams in a wheelchair, but it appeared, he never used a wheelchair outside of attending VA appointments. PSR at ¶ 12. Moreover, the Defendant only reported being wheelchair-bound during C&P Exams, which were the only exams impacting his disability compensation award. The Defendant willfully acted to misrepresent his abilities to use his lower extremities in a scheme to defraud the VA out of disability compensation funds he was not entitled to. *Id.* As detailed at trial, the Defendant received all those funds tax-free.

The nature and circumstances of the Defendant's offenses are serious. He stole over $700,000 in benefits from the federal government over the course of 14 years. That money should have been provided to eligible veterans, not treated as a slush fund by the Defendant, so he could avoid working.

### B. History and Characteristics of the Defendant

The Defendant's history and characteristics are mixed. According to the PSR, he was born to teenage mother and was raised in part by his maternal grandmother. PSR at ¶ 44. However, he was raised in a "loving" environment. *Id.* He had a normal childhood. While the Defendant's mother struggled with drugs, she recovered and provided him with a stable residence. *Id.* The Defendant went straight into the military after high school and has no adult criminal convictions. PSR at ¶¶ 38 and 45-46. While the Defendant was injured in a 2005 military bombing, after the bombing, he was able to re-marry and have additional children. PSR at ¶¶ 45-46. While he defrauded the VA for more than a decade, the Defendant appears to be an active father.

11

### C. Need to Afford Adequate Deterrence to Criminal Conduct

Under 18 U.S.C. § 3553(a)(2)(B), there is a need "to afford adequate deterrence to criminal conduct." A sanction needs to be imposed to send a signal to others who would contemplate engaging in exaggerating their injuries to secure unlawful benefits. A sentence of 41 months of incarceration for this fraudulent scheme deters others.

General deterrence is a particularly important sentencing factor in fraud or property crime cases such as this one because it is viewed to be effective. *See United States v. Martin¸* 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Edwards¸* 595 F.3d 1004, 1021 (9th Cir. 2010)("[B]ank fraud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision.").

The Defendant defraud the VA and stole from the US Government for over 14 years. Each and every time he received a deposit into his bank account, and then spent those funds, he knew he was being overpaid by the VA. The Defendant acted with criminal intent and plans to continuously and knowingly conceal his ability to walk and move his lower extremities.

### D. Need to Avoid Unwarranted Sentencing Disparities

Under 18 U.S.C. § 3553(a)(6), there is a need to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." It should be noted that in all of the cases below, the defendants pled guilty which affected their guidelines. Moreover, here, the Defendant engaged in unbecoming conduct during his appearance at the

motion hearing on May 9, 2024, and during his trial: arriving in a wheelchair, attempting to wear his military uniform, feigning aggravation of symptoms, and lying under oath.

In *United States v. Christopher Stultz*, (23-082-JL-AJ, D.N.H.), the defendant pled guilty to making false statements, under 18 U.S.C. § 1001(a)(2), regarding his physical disabilities, namely that he could not walk and needed a wheelchair. The defendant had received more than $660,000 in disability benefits and was sentenced to 18 months in prison.

In *United States v. Zachary Barton*, (21-80106-AMC, S.D. Fla.), the defendant pled guilty to falsely claiming to have Post-Traumatic Stress Disorder as well as physical disabilities, collecting over $240,000 in VA benefits to which he was not entitled. The defendant was given a one-year prison sentence.

In *United States v. James Stiles*, (18-816-JAK, C.D. Cal.), the defendant falsely held himself out to be a combat veteran so he could obtain health care and housing benefits totaling over $160,000 in a three-and-a-half-year period. The defendant pled guilty and was sentenced to 16 months in federal prison.

In *United States v. Richard Meleski*, (19-676-TJS, EDPA), the defendant falsely claimed to have served as a Navy SEAL and falsely obtained healthcare benefits from the VA totaling over $300,000. The defendant had never served in the military. The defendant pled guilty to healthcare fraud and related charges, and he was sentenced to three years and four months in prison.

In *United States v. Angela Farr*, (PX-19-443, the defendant pled guilty to conspiracy to commit Theft of Government Property in connection with fraudulently obtaining disability benefits from the VA and from the SSA, totaling just over $1M: $440,000 in VA benefits alone. The defendant was sentenced to 30 months.

### E. Recommended Term of Supervised Release

The Government also seeks the imposition of a 3-year term of supervised release for the same reasons as stated above. A significant period of supervised release will promote respect for the law and ensure protection of the public while the Defendant is under supervision. The Defendant has never been charged, nor sentenced, federally and the Defendant could benefit from federal supervised release.

## VI. Forfeiture and Restitution

The Government respectfully requests that the Court order the Defendant to pay a total of **$774,367.05** in restitution, which reflects the total financial loss to the victim, the VA.

| Victim | Amount |
|---|---|
| VA Debt Management Center<br>P.O. Box 11930<br>St. Paul, MN 55111-0930<br><br>*On memo line, list the following:*<br><br>William Rasheem Jamal Rich, file number – 0521296930030. District Court Case number: BAH-21-432 | $774,367.05 |
| Total | $774,367.05 |

The Government also respectfully requests that the Court incorporate the motion for preliminary order of forfeiture, filed on September 24, 2024, (ECF No. 134), into its judgment at sentencing.

## VII. Conclusion

For the foregoing reasons, and additional information that may be presented at the sentencing hearing, the Government respectfully requests that the Court impose a term of imprisonment of 41 months, followed by 3 years of supervised release, which the Government views as sufficient, but not greater than necessary, to achieve the purposes of sentencing.

                                        Respectfully submitted,

                                        Erek Barron
                                        United States Attorney

                                By:    /s/
                                        Kertisha Dixon
                                        Special Assistant United States Attorney
                                        Colleen Elizabeth McGuinn
                                        Assistant United States Attorney

cc:       Gerald Ruter, Esquire
           Melissa McGuinness, U.S. Probation Officer